IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–02146–EWN


HENRY MONROE,

      Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

This is a social security benefits appeal. Plaintiff Henry Monroe challenges the final

decision of the Commissioner of Social Security (the "Commissioner") denying his application for

social security disability insurance benefits. Jurisdiction is premised upon 42 U.S.C. § 405(g).

## FACTS

### 1. Medical Evidence

Plaintiff was born on March 11, 1949, and was 53 years old at the onset of his alleged

disability. (Admin. R. at 59 [filed Jan. 4, 2007] [hereinafter "Admin. R."].) Plaintiff completed

the twelfth grade, and worked in the vocationally relevant past as a "winding technician," heating

and air conditioning technician, and general industrial worker. (*Id*. at 74, 81.) Plaintiff alleges

that he became unable to work beginning on February 14, 2003, due to an enlarged heart, diabetes, hypertension, a herniated disc, gout, a chronic cough, and an aching hip. (*Id.* at 71.)

### a. Treatment Records

#### (1) Records Submitted to the ALJ

On September 13, 2000, a physical therapist wrote a discharge summary for Plaintiff. (*Id.* at 139.) Plaintiff had entered into therapy for radiating numbness and tingling in his back and right hip. (*Id.*) The physical therapist reported mixed results — some activities alleviated Plaintiff's symptoms while others exacerbated them. (*Id.*)

On September 14, 2000, a magnetic resonance image ("MRI") of Plaintiff's lumbar spine was taken. (*Id.* at 218–19.) The assessing doctor found "[m]oderately advanced multilevel discogenic degenerative changes" involving two vertebrae in Plaintiff's low back. (*Id.* at 219.)

On February 21, 2003, Plaintiff presented to Tracy Bullard, M.D., with a fever and congestion that had persisted for three weeks. (*Id.* at 159.) Dr. Bullard prescribed antibiotics. (*Id.*) On March 12, 2003, Plaintiff returned to Dr. Bullard with continued cold symptoms and a sputum-producing cough. (*Id.* at 157.) Plaintiff's fever had resolved. (*Id.*) Dr. Bullard requested a number of tests, which proved inconclusive. (*Id.*) On March 17, 2003, Plaintiff returned to Dr. Bullard, reporting mild improvement with his cough and stating that he had not returned to work due to the cough's "interference with his daily duties." (*Id.* at 156.) Dr. Bullard referred Plaintiff to a respiratory specialist. (*Id.*)

On May 15, 2003, Plaintiff saw Irlene Locklear, M.D., for his persistent cough. (*Id.* at 132.) Plaintiff reported that the cough started in February 2003, when he was treated for

pneumonia.  (*Id.*)  Plaintiff reported the cough was better but nonetheless persistent, and that he had not returned to work because of it.  (*Id.*)  Dr. Locklear characterized the cough as "dry" and "nonproductive."  (*Id.*)

In May and June 2003, Plaintiff saw Dr. Bullard with regard to his diabetes, which was apparently exacerbated by medications he was taking for his cough.  (*Id.* at 152.)  The cough persisted.  (*Id.*)  Dr. Bullard noted that Plaintiff suffered from hypertension.  (*Id.* at 154.)

On June 17, 2003, Plaintiff returned to Dr. Locklear for his chronic cough, which Dr. Locklear noted had not resolved on several different medications.  (*Id.* at 130.)  Dr. Locklear noted that Plaintiff had a cough "only [three to four] times per day."  (*Id.*)  Dr. Locklear scheduled a bronchoscopy, but "suspect[ed] it w[ould] be normal."  (*Id.*)  On June 24, 2003, Dr. Locklear performed the bronchoscopy to examine the cause of Plaintiff's chronic cough.  (*Id.* at 124.)  No evidence of abnormalities was found, but Dr. Locklear did obtain samples to send for microbiological testing.  (*Id.*)

On July 2, 2003, Plaintiff returned to Dr. Locklear, who prescribed antibiotics to treat moderate growth of strep bacteria in Plaintiff's bronchi.  (*Id.* at 128.)  Dr. Locklear expressed uncertainty as to whether the bacteria caused Plaintiff's cough.  (*Id.*)

In July and August 2003, Plaintiff twice saw Dr. Bullard for monitoring and treatment of his diabetes.  (*Id.* at 150–51.)  Dr. Bullard altered Plaintiff's diabetes medications.  (*Id.*)

On August 21, 2003, Plaintiff visited an emergency room, complaining of three days of pain in his left knee due to gout.  (*Id.* at 135–37.)  The treating physician obtained an x-ray, which

revealed "no acute abnormality." (*Id.* at 136.) Plaintiff was given Percocet and was referred to his regular doctor for a follow-up appointment.[1] (*Id.*)

On August 24, 2003, Plaintiff saw Dr. Bullard regarding his diabetes. (*Id.* at 149.) Dr. Bullard noted that Plaintiff's blood sugar was well-controlled, and Plaintiff had been compliant with his medications. (*Id.*) Plaintiff "stated he still occasionally ha[d] a cough, otherwise [it] ha[d] pretty much resolved." (*Id.*)

On August 19, 2003, Plaintiff visited Sarah Kim, M.D., a specialist in allergies. (*Id.* at 183–85.) Plaintiff reported that he had suffered difficulty breathing since the 1980s and that his symptoms had increased in severity and frequency over time. (*Id.* at 183.) Plaintiff reported that he had wheezing and shortness of breath with exertion and that his cough occurred periodically, but that his symptoms were worse during the spring and at night. (*Id.*) Plaintiff also complained of nasal congestion, sneezing, an itchy nose, and other allergy-related symptoms, which occurred year-round with greatest severity in the spring and at night. (*Id.*) Dr. Kim diagnosed: (1) chronic cough; (2) intermittent shortness of breath; (3) drug hypersensitivity; (4) and chronic sinusitis. (*Id.* at 184.) Dr. Kim recommended that Plaintiff avoid exposure to dust and molds. (*Id.* at 185.) Dr. Kim prescribed a variety of allergy medications. (*Id.*)

---

[1]Percocet is the brand name for a painkiller containing oxycodone, a narcotic pain reliever. J.E. SCHMIDT, M.D., 4–P ATTORNEYS' DICTIONARY OF MEDICINE 3309–10 (Matthew Bender 2005).

On October 10, 2003, Plaintiff saw Dr. Bullard's co-clinician, James Mergy, M.D., reporting that his gout was "much improved" and that he had no other complaints. (*Id.* at 148.) Plaintiff's blood sugar remained at appropriate levels. (*Id.*)

On December 12, 2003, Plaintiff returned to Dr. Bullard "for a follow up of blood pressure." (*Id.* at 147.) Dr. Bullard prescribed a medication for hypertension. (*Id.*)

On January 13, 2004, Plaintiff saw a clinician in Dr. Bullard's office, Lori Haigler, M.D., complaining of a gout flare-up in his right elbow, which caused pain and limited movement. (*Id.* at 211.) Plaintiff reported that the pain improved on medication. (*Id.*) Dr. Haigler instructed Plaintiff to continue his gout medications. (*Id.*)

On March 9, 2004, Plaintiff saw Dr. Bullard to request prescription refills. (*Id.* at 216.) Dr. Bullard performed an examination and assessed diabetes and hypertension, but made no note pertaining to Plaintiff's cough. (*Id.*) Plaintiff's condition remained stable through July and August 2004 follow-ups. (*Id.* at 212–15.)

On March 15, 2005, Plaintiff returned to Dr. Haigler. (*Id.* at 208.) Plaintiff denied "any pain or any other problems" or "any further flare-ups of his gout." (*Id.*)

On October 10, 2005, M.A. Hannan, M.D., Ph.D., opined on a prescription pad that Plaintiff "would have considerable difficulty for [sic] prolonged sitting or paying attention to any proceeding." (*Id.* at 217.)

On November 6, 2005, Dr. Haigler wrote a letter to Plaintiff's counsel, noting Plaintiff's medical problems "include hypertension and gout." (*Id.* at 224.) Dr. Haigler stated Plaintiff "had several debilitating episodes of gout," but that the disorder was "being managed with

medical therapy." (*Id.*)  Dr. Haigler reported that Plaintiff stated he had not "been able to work regularly in the past three years secondary to severe pain during [his] gout flares." (*Id.*)

### (2)    *Pre-Hearing Records Submitted to the Appeals Council*

On August 18, 2005, Plaintiff saw Dr. Hannan, reporting good control of his blood pressure and blood sugar.  (*Id.* at 262.)  Plaintiff reported his cough had improved since decreasing one of his blood pressure medications.  (*Id.*)

On August 29, 2005, Plaintiff had a walk-in visit with Dr. Hannan.  (*Id.* at 260.)  Plaintiff complained of swelling in his right elbow over the past three days.  (*Id.*)  Dr. Hannan found a cyst in Plaintiff's tendon, which was not due to gout.  (*Id.*)

On November 18, 2005, Plaintiff returned to Dr. Hannan.  (*Id.* at 258.)  Plaintiff reported no headaches or dizziness due to his hypertension, but complained of joint pain in his neck and one knee.  (*Id.*)  The notes do not indicate the cause of the pain.  (*Id.*)

On January 4, 2006, Plaintiff visited an emergency room with a gout flare-up in his left foot, which he stated had begun in November and had not improved.  (*Id.* at 246–55.)  The treating doctor  prescribed a number of medications.  (*Id.* at 246.)

On January 23, 2006, Plaintiff saw Dr. Hannan for a follow-up appointment.  (*Id.* at 256–57.)  Plaintiff reported that he had visited the emergency room with a gout flare-up, which had since improved on medication.  (*Id.* at 256.)  Plaintiff denied having a cough.  (*Id.*)  Dr. Hannan prescribed refills of Plaintiff's medications for blood pressure, diabetes, and gout.  (*Id.* at 257.)

### (3) Post-Hearing Records

On March 17, 2006, Plaintiff saw Mayer Horensten, D.O., complaining of: (1) pain in his left foot persisting since November; and (2) pain in his left hand. (*Id.* at 291.) Plaintiff stated it was painful for him to walk. (*Id.* at 291.) Dr. Horensten sought an x-ray of Plaintiff's left foot and advised him to take "Baby Aspirin" for the pain. (*Id.*) The x-ray revealed gout in Plaintiff's toe. (*Id.* at 305.)

On March 24, 2006, Plaintiff saw Dr. Horensten and complained of both severe pain in his right leg and a sputum-producing cough. (*Id.* at 289.) Dr. Horensten could not determine the etiology of the leg pain. (*Id.*)

On April 14, 2006, Plaintiff returned to Dr. Horensten, requesting "Percocet because Tylenol with Codeine [was] not helping his occasional pain in the right foot." (*Id.* at 286.) Dr. Horensten noted Plaintiff's gout had improved. (*Id.*)

On April 28, 2006, an x-ray of Plaintiff's right knee was taken. (*Id.* at 280.) The examining radiologist found: (1) no convincing evidence of erosive disease; (2) some degenerative changes; (3) a possible small effusion; and (4) slight thickening of tissue, possibly related to trauma. (*Id.* at 280.)

On May 11, 2006, Plaintiff saw Dr. Horensten, complaining of pain in his jaw. (*Id.* at 282.) Dr. Horensten could not determine the etiology of the pain, but noted Plaintiff's: (1) gout was stable; (2) hypertension was improving; and (3) diabetes was well-controlled. (*Id.*)

### b. Functional Capacity Evaluations

On February 3, 2004, David Buchia, M.D., a non-treating source, conducted a functional capacity evaluation of Plaintiff. (*Id.* at 200–07.) Dr. Buchia found Plaintiff could: (1) lift fifty pounds occasionally; (2) lift twenty-five pounds frequently; (3) stand and/or walk for approximately six hours in an eight-hour work day; (4) sit for approximately six hours in an eight-hour work day; and (5) push or pull without any restrictions. (*Id.* at 201.) Dr. Buchia found Plaintiff had no postural, manipulative, visual, or communicative limitations. (*Id.* at 202–03.) Dr. Buchia determined that Plaintiff should avoid concentrated exposure to: (1) fumes, odors, dusts, gases, and poor ventilation; and (2) hazards, such as machinery and heights. (*Id.* at 204.)

On March 10, 2004, Dr. Joel Dascal, M.D., reviewed a more complete medical history than that presented to Dr. Buchia and affirmed the accuracy of Dr. Buchia's functional capacity assessment. (*Id.* at 199.)

### 2. Procedural History

On October 14, 2003, Plaintiff filed an application for disability insurance benefits. (*Id.* at 59.) On February 5, 2004, the Social Security Administration denied Plaintiff's application. (*Id.* at 43.) On March 11, 2004, the Social Security Administration again denied Plaintiff's application on reconsideration. (*Id.* at 50.) On March 22, 2004, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 52.)

On November 22, 2005, the ALJ held a hearing at which Plaintiff testified, represented by an attorney. (*Id.* at 311.) Plaintiff testified that he suffered a gout attack three weeks earlier. (*Id.* at 312–13.) Plaintiff reported gout attacks in his feet, hands, shoulders, and neck occurring more

or less every month and lasting at least one week. (*Id.* at 315, 318.) Plaintiff reported pain so bad that he could not "stand for [sic] a bed sheet to touch [his] feet. (*Id.* at 316.) Plaintiff stated he had used crutches to get around since the 1980s whenever he had a bad attack. (*Id.*) Plaintiff indicated that when gout flare-ups occurred: (1) in his hands, he could not bathe; and (2) in his shoulders, he could not reach. (*Id.* at 319–20.) Plaintiff reported taking Percocet every two or three weeks for his pain. (*Id.* at 322.)

Plaintiff denied engaging in any activity. (*Id.*) Plaintiff testified that, because of his gout, he could: (1) sit only for a short period of time because of pain in his knees; (2) stand for only ten to fifteen minutes due to back pain; and (3) walk only two-hundred yards without serious discomfort. (*Id.* at 312, 322–23.) Plaintiff reported that he had been using a cane to walk for the past year. (*Id.* at 323.)

Plaintiff also reported: (1) hip problems going back eight years, which were possibly related to a herniated disc; (2) constant swelling in his feet; (3) shortness of breath when walking, bending down, sitting, and laying down; (4) dizziness when he got out of bed; and (5) success in controlling his blood sugar levels. (*Id.* at 313–15, 324–27.)

Plaintiff represented that he had stopped working in February 2003 due to walking pneumonia, which had given him a severe cough. (*Id.* at 314.) Plaintiff testified that he was unable to return to his past work, but that "[i]f I could I would love to go to Iraq, but I know I can't. And I run to the bathroom pretty often." (*Id.* at 329.)

Plaintiff indicated that his sister came over "at times" to help with housework and that he ate canned and microwavable foods. (*Id.* at 327.) Plaintiff stated that he drove two or three times each week, going to church and the grocery store. (*Id.*)

On February 16, 2006, the ALJ issued a decision, finding that Plaintiff was capable of performing his past relevant work as a "winding technician." (*Id.* at 17–23.) In reaching his conclusion, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since February 14, 2003. (*Id.* at 22.) The ALJ next determined that Plaintiff's gout constituted a severe impairment. (*Id.*) However, the ALJ further determined that the gout did not meet or equal the criteria of any impairments listed in Appendix 1, Subpart P, Regulations Number 4. (*Id.* at 19.) The ALJ found that Plaintiff's diabetes and hypertension were not severe impairments because they were well-controlled with the use of oral medications. (*Id.*) The ALJ also determined that Plaintiff's degenerative disc disease was not severe because Plaintiff "ha[d] not complained of lower back pain in several years and there [were] no back abnormalities on [p]hysical exam, despite some defects on x-rays which are probably typical for his age." (*Id.* at 19–20.) Additionally, the ALJ found that Plaintiff's persistent cough was not the result of chronic lung disease and, thus, was not severe. (*Id.* at 20.)

The ALJ determined that the record contained "no evidence of any treatment by Dr. Hanna [sic]" and, thus, found that the opinion was not entitled to controlling weight.[2] (*Id.*) The ALJ continued:

> Even if this were not the case, however, [Dr. Hannan's] opinion about the disabling effect of [Plaintiffs'] "multiple medical conditions" was vague and was offered without analysis or rationale. Furthermore, it was completely inconsistent with the medical evidence of record, which contained nothing to substantiate any difficulties with prolonged sitting or paying attention. For all these reasons, the opinion of Dr. Hanna [sic] has been given no weight.

(*Id.* at 20.)

With respect to Dr. Haigler's opinions, the ALJ noted that she did not express an opinion on Plaintiff's functional capacity or the issue of disability:

> [Dr. Haigler] reported only that [Plaintiff's] gout had been "debilitating" on several occasions in the past several years and that *the claimant contended* that he was unable to work. Since Dr. Haigler did not express an opinion, no weight must be assigned. The undersigned notes, however, that the progress notes from Dr. Haigler indicated only one flare-up of gout in the past several years.

(*Id.* [emphasis in original].)

With regard to Plaintiff's credibility, the ALJ determined that Plaintiff's complaints of monthly flare-ups of gout and chronic low back and right hip pain "seem[ed] to be overstated." (*Id.*) The ALJ emphasized that: (1) notes regarding Plaintiff's "brief episodes of gout" showed non-compliance with medication and an absence of pain; (2) there was no medical report of back or hip pain for several years; (3) Plaintiff had reported no trouble walking or standing to any

---

[2]At the time of the hearing, the ALJ had only one opinion from Dr. Hannan: the note scrawled on a prescription pad stating Plaintiff "would have considerable difficulty for [sic] prolonged sitting or paying attention to any proceeding." (Admin. R. at 217.)

doctor; and (4) Plaintiff's "contention that he experience[d] monthly flare-ups of gout was completely unsubstantiated by the medical evidence . . . , which reflected only two such flare-ups in the past two years." (*Id.*) The ALJ noted that, although the evidence showed Plaintiff's gout "could reasonably be expected to produce some of the pain and other symptoms alleged, the evidence did not support [Plaintiff's] allegations of the intensity and persistence of such pain and other symptoms." (*Id.* at 21.) Accordingly, the ALJ determined Plaintiff's testimony was inconsistent with the weight of the medical evidence and, thus, was not wholly credible. (*Id.* at 20–21.)

Based upon his consideration of the evidence — particularly the "well-reasoned" functional capacity assessments of state agency physicians — the ALJ determined Plaintiff had the residual functional capacity ("RFC") to: (1) lift and carry up to twenty-five pounds frequently and up to fifty pounds occasionally; (2) stand and walk for a total of six hours in an eight-hour work day; and (3) sit for up to six hours in an eight-hour work day. (*Id.* at 21.) Accordingly, the ALJ determined Plaintiff could return to his past work as a "winding technician," based "in part" on Plaintiff's own description of the job. (*Id.*) Thus, the ALJ determined Plaintiff was not "disabled" at any time prior to the decision. (*Id.*)

On March 15, 2006, Plaintiff requested a review of the ALJ's decision, submitting additional medical reports from Drs. Hannan and Horensten. (*Id.* at 6, 13.) On August 23, 2006, the Appeals Council affirmed the ALJ's decision, stating that the additional evidence did not provide a basis for changing the ALJ's decision. (*Id.* at 5–7.) On October 26, 2006, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability benefits. (Compl.

[filed Oct. 26, 2006].)  On February 22, 2007, Plaintiff filed his opening brief.  (Pl.'s Opening Br.

[filed Feb. 22, 2007] [hereinafter "Pl.'s Br."].)  On March 21, 2007, the Commissioner filed a

response.  (Def.'s Resp. Br. [filed Mar. 21, 2007] [hereinafter "Def.'s Resp."].)  On April 6,

2007, Plaintiff filed his reply.  (Pl.'s Reply Br. [filed Apr. 6, 2007] [hereinafter "Pl.'s Reply"].)

This matter is fully briefed.

## ANALYSIS

*1.*     *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2006)

(incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant

part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported
> by substantial evidence, shall be conclusive, and where a claim has been denied by
> the Commissioner of Social Security or a decision is rendered under subsection (b)
> of this section which is adverse to an individual who was a party to the hearing
> before the Commissioner of Social Security, because of failure of the claimant or
> such individual to submit proof in conformity with any regulation prescribed under
> subsection (a) of this section, the court shall review only the question of
> conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g) (2006).  Thus, this court's review is limited to determining whether the record

as a whole contains substantial evidence supporting the Commissioner's decision.  *See id.*;

*Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).

"Substantial evidence" means "more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Jozefowicz v. Heckler*, 811

F.2d 1352, 1357 (10th Cir. 1987) (citations omitted).  The court must uphold the Commissioner's

decision if it is supported by substantial evidence.  *See Dollar v. Bowen*, 821 F.2d 530, 532 (10th

Cir. 1987).  This court cannot reweigh the evidence nor substitute its judgment for that of the

ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987).  That does not mean, however,

that this court's review is merely cursory.  To find that the ALJ's decision is supported by

substantial evidence, the record must include sufficient relevant evidence that a reasonable person

might deem adequate to support the ultimate conclusion.  *Frey v. Bowen*, 816 F.2d 508, 512

(10th Cir. 1987).  A decision is not based on substantial evidence if it is overwhelmed by other

evidence in the record or if there is a mere scintilla of evidence supporting it.  *Turner v. Heckler*,

754 F.2d 326, 328 (10th Cir. 1985).  The ALJ's decision is also subject to reversal for application

of the wrong legal standard.  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816

F.2d at 512.

## 2.    *Evaluation of Disability*

The qualifications for disability insurance benefits under the Social Security Act are that

the claimant meet the insured status requirements, be less than sixty-five years of age, and be

under a "disability."  *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).  The Social Security

Act defines a disability as an inability "to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months."  42 U.S.C. § 1382c(a)(3)(A) (2006).  In proving disability, a claimant must make

a *prima facie* showing that he is unable to return to the prior work he has performed.  *Huston v.*

-14-

*Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).  Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform.  *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits.  *See* 20 C.F.R. § 404.1520 (2007); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis).  A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded.  *See* 20 C.F.R. § 404.1520(a) (2007); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).  First, the claimant must demonstrate that he is not currently involved in any substantial gainful activity.  20 C.F.R. § 404.1520(b) (2007).  Second, the claimant must show a medically severe impairment (or combination of impairments) which limits his physical or mental ability to do basic work activities.  *Id.* § 404.1520(c).  At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled.  *Id.* § 404.1520(d).  If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step.  At this stage, the claimant must show that the impairment prevents him from performing work he has performed in the past.  *See Williams*, 844 F.2d at 751 (citations omitted).  If the claimant is able to perform his previous work, he is not disabled.  20 C.F.R. § 404.1520(f) (2007); *Williams*, 844 F.2d at 751.  The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's

age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(g) (2007); *Williams*, 844 F.2d at 751.

## 3. *Disability Determination*

Plaintiff sets forth four arguments in support of his contention that the ALJ's decision is erroneous. (Pl.'s Br. at 14–24.) Plaintiff asserts that the ALJ erred by: (1) assessing Plaintiff's RFC and determining it permitted him to return to his past relevant work; (2) improperly weighing the medical evidence; (3) improperly determining that Plaintiff's "pulmonary impairment," back pain, and hypertension were not severe; and (4) wrongly finding that Plaintiff was not fully credible. (*Id.*) Although the bulk of Plaintiff's arguments are founded upon gross mischaracterizations of the ALJ's opinion, two arguments nonetheless necessitate remand. I begin with those two arguments.

### a. *Errors at Step Four*

First, Plaintiff asserts that, although the ALJ found Drs. Buchia's and Dascal's opinions to be "well-reasoned," he failed to include their pulmonary limitations in his RFC. (*Id.* at 17.) Second, Plaintiff argues that the ALJ's step-four finding that Plaintiff could return to his past relevant work as a "winding technician" is inconsistent with the ALJ's RFC determination. (*Id.* at 15.) I agree on both counts.

### (1) *Exclusion of Plaintiff's Pulmonary Restrictions Was Unfounded*

Drs. Buchia and Dascal both agreed that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Admin. R. at 199, 204.) Their conclusions comport with Dr. Kim's assessment that Plaintiff's chronic cough and allergy-related symptoms

required Plaintiff to avoid exposure to dust and molds. (*Id.* at 184–85.) In his opinion, the ALJ

failed to explain why he did not include any pulmonary limitations in Plaintiff's RFC. (*See id.* at

17–23.) This is particularly confounding in light of the ALJ's characterization of the opinions of

Drs. Buchia and Dascal as "well-reasoned." (*Id.* at 21.) Even though I find below that the ALJ

did not err in determining that Plaintiff's "pulmonary impairment" was not severe, I cannot uphold

the ALJ's unexplained decision to omit from Plaintiff's RFC the respiratory limitations espoused

by three doctors. *See* 20 C.F.R. § 404.1545(a)(2) (2007) (in determining RFC, the ALJ "will

consider all of your medically determinable impairments of which [he is] aware, including your

medically determinable impairments that are not 'severe'"); Soc. Sec. Ruling 96–8p, 1996 WL

374184, at *7 (July 2, 1996) ("If the RFC assessment conflicts with an opinion from a medical

source, the adjudicator must explain why the opinion was not adopted."). On remand, the ALJ

must either account for his exclusion of the pulmonary limitations expressed by Drs. Kim, Buchia,

and Dascal, or incorporate those limitations into Plaintiff's RFC.

### (2) *The Work to Which the ALJ Determined Plaintiff Could Return Was Precluded by the ALJ's RFC Determination*

In determining what work Plaintiff's RFC enabled him to perform, the ALJ stated: "Based

in part on [Plaintiff's] own description of his past relevant work as a winding technician (Exhibit

1E), the undersigned finds that [Plaintiff] can return to his past relevant work as a winding

technician, at least as he actually performed the job." (Admin. R. at 21.) "Exhibit 1E" is a

disability report filled out by Plaintiff. (*Id.* at 70–84.) Therein, Plaintiff described his "winding

technician" work as a factory job that involved: (1) lifting fifty pounds *frequently*; and (2)

standing and walking for *seven hours* in an eight-hour day. (*Id.* at 74.) In contrast, the ALJ

determined Plaintiff's RFC allowed him to: (1) lift fifty pounds *occasionally*; and (2) stand and

walk for a total of *six hours* in an eight-hour work day. (*Id.* at 21.) Although the ALJ stated that

he relied only "in part" on Plaintiff's characterization of the job, the ALJ gave no indication as to

what else — be it caselaw, regulation, fact, or fancy — he relied on in making his finding. (*See*

*id.* at 21.) Thus, I can hardly say that the ALJ's decision was based on substantial evidence. On

remand, the ALJ must either: (1) unveil the mysterious source upon which he relied; or (2)

determine whether Plaintiff can return to any of his other past relevant work and, if necessary,

proceed to step five.

### b.    Plaintiff's Further Arguments

Despite the fact that Plaintiff had two valid arguments, Plaintiff's counsel nevertheless

chose, unnecessarily, to waste both her opponent's and this court's time with a plethora of further

arguments, all of which are unfounded. As this court has said before: "At the level of removal

[from] which this court reviews an ALJ's decision, one argument that is calibrated and delivered

with the precision of a sharpshooter's bullet is far more persuasive than twenty allegations

scattered like the buckshot of a bourbon-soaked duck hunter." *Colby v. Barnhart*,

06–cv–01121–EWN, at 32 (D. Colo. Aug. 2, 2007). Below, I briefly address Plaintiff's spurious

arguments.

### (1)    Weight Accorded to the Opinions of Drs. Haigler and Hannan

Plaintiff faults the ALJ for "saying that there was no evidence that Dr. Hannon [sic] was a

treating source." (Pl.'s Br. at 17.) While the evidence Plaintiff eventually submitted to the

Appeals Council did prove that Dr. Hannan was a treating source, Plaintiff completely ignores the

fact that the ALJ expressly found that "*even if*" Dr. Hannan were a treating source, his opinion

was vague and "completely inconsistent" with the medical record.[3]  (Admin. R. at 20 [emphasis

added].)  This conclusion was well-founded.  The opinion referenced by the ALJ is scrawled on a

prescription pad, stating that Plaintiff "would have considerable difficulty for [sic] prolonged

sitting or paying attention to any proceeding."  (*Id.* at 217.)  The clinical notes from Dr. Hannan

that Plaintiff submitted to the Appeals Council do not support this finding — nor does any other

piece of medical evidence in the record.  (*See* Admin. R.)  The scrawled note is an anomaly, and

the ALJ was wise to disregard it as vague and inconsistent with other record evidence.  *See*

*Watkins*, 350 F.3d at 1300.

Plaintiff also faults the ALJ for "failing to get additional records from treating source Dr.

Hannon [sic]."  (Pl.'s Br. at 17.)  Plaintiff fails to cite to any authority supporting the implicit

proposition that an ALJ has a duty to request additional records from a one-time treating source

whose opinion is entirely inconsistent with the vast majority of medical evidence.  *See Gutierrez v.*

*Astrue*, No. 07-2057, 2007 WL 3226504, at *3 (10th Cir. Oct. 31, 2007) (stating duty to

recontact treating source is not triggered unless the overall evidence is inadequate to determine

whether claimant is disabled); *see also* Soc. Sec. Ruling 96–8p, 1996 WL 374184, at *5

(requiring ALJ to "make every *reasonable* effort to ensure that the file contains sufficient

---

[3]Thus, Plaintiff's further contention that the ALJ "based his entire analysis of Dr.
Hannon's [sic] opinion" on the faulty conclusion that Dr. Hannan was not a treating source is
based on either a shoddy reading of the ALJ's opinion or an outright misrepresentation.  (*See* Pl.'s
Reply at 7.)  Either way, the court is greatly displeased.

evidence to assess RFC" [emphasis added]).  An ALJ has no obligation to go on a fishing expedition every time a one-time medical source offers an anomalous opinion.

Similarly, Plaintiff faults the ALJ for stating that Dr. Haigler "'did not express an opinion'" in a letter the doctor submitted on Plaintiff's behalf.  (Pl.'s Br. at 18.)  Plaintiff takes the ALJ's words out of context: the ALJ discounted Dr. Haigler's letter because it "did not express an opinion *regarding [Plaintiff's] residual functional capacity.*"  (Admin. R. at 20 [emphasis added].)  Indeed, although Dr. Haigler stated in the letter that Plaintiff "had several debilitating episodes of gout," she also stated that Plaintiff's "gout [was] being managed with medical therapy."  (*Id.* at 224.)  Moreover, although Dr. Haigler wrote that "[Plaintiff] states he hasn't been able to work regularly for the past three years secondary to severe pain during these gout flares," this is hardly a convincing statement of medical opinion that Plaintiff cannot work because: (1) it merely repeats Plaintiff's own representation, not Dr. Haigler's medical opinion; and (2) the record reveals that Plaintiff only complained of gout symptoms *two times* from February 2002 to the date of Dr. Haigler's letter, November 6, 2005.  (*Id.* at 135, 211.)  The ALJ did not err in discounting this letter.

### (2) The ALJ's Finding that Plaintiff's Back Pain, Cough, and Hypertension Were Not Severe

A severe impairment is one that "significantly limits [one's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c) (2007).  The term "basic work activities" includes the capacities to stand, walk, see, hear, speak, follow simple instructions, use judgment,

and interact with others. *Id.* § 404.1521(b). Plaintiff contends the ALJ erred in finding his back pain, pulmonary impairment, and hypertension were not severe. (Pl.'s Br. at 19–21.) I disagree.

First, Plaintiff faults the ALJ for substituting his "lay opinion" for medical evidence because the ALJ noted Plaintiff's back problems were "probably typical for his age." (*Id.* at 19.) While the ALJ's editorialization was unnecessary, when it is viewed in the context of his further observation — which, of course, Plaintiff fails to mention — that Plaintiff had not complained of back problems for *several years*, it becomes apparent that the ALJ's determination that Plaintiff's back problem was not severe was premised on substantial evidence. (Admin. R. at 18.) Other than Plaintiff's complaints of back pain to the ALJ at the hearing, the only reference to back pain in the record is from August 2000 — more than two years *before* Plaintiff claims to have become disabled due to a severe cough. (*See id.* at 139, 218–19.) That Plaintiff worked for two years with this "impairment" and, subsequently, neglected to mention back pain to his doctors for two *more* years reveals that there was scant medical evidence upon which to premise a finding that Plaintiff's back pain constituted a "severe" impairment.

Second, Plaintiff argues that his "pulmonary impairment" was severe. (Pl.'s Br. at 20.) At best, the record reflects two lung-related symptoms, diagnosed by Dr. Kim: (1) intermittent shortness of breath; and (2) a chronic cough. (*See* Admin. R. at 184.) With regard to shortness of breath, beyond Plaintiff's complaints to Dr. Kim and the ALJ, the record is otherwise devoid of complaints about that symptom. (*Cf. id.* at 133, 153, 154, 157, 212 [denying shortness of breath].) With respect to his cough, Plaintiff mistakes persistence for severity. Although Plaintiff's cough persisted for some time, leading him to tell two of his doctors that it prevented

him from going back to work, a substantial body of evidence reveals that the cough did not significantly limit Plaintiff's physical ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c) (2007). The cough began in February 2003. (Admin. R. at 159.) Plaintiff regularly sought treatment in February and March 2003. (*Id.* at 156–58.) No record of treatment exists from April 2003. By May 2003, the cough was better but still persistent. (*Id.* at 132.) By June 2003, Plaintiff reported having a cough only three or four times per day. (*Id.* at 130.) By August 2003, Plaintiff represented that he still coughed occasionally, but it "ha[d] pretty much resolved." (*Id.* at 149.) When Plaintiff saw Dr. Kim, an allergy specialist, in September 2003, she recognized that he had a "chronic cough" due to allergies, which should be treated with various medications. (*Id.* at 183–85.) Although Dr. Kim restricted Plaintiff from dust and mold exposure, this hardly suggests Plaintiff's cough precluded him from conducting basic work activities. *See* 20 C.F.R. § 404.1521(b) (2007). Moreover, Plaintiff's medical records from 2004 and 2005 are devoid of any reference to a serious coughing problem. (*See* Admin. R. at 199–208, 211–17, 219–24, 258–62.) Although Plaintiff reported a sputum-producing cough in late March 2006, there is no mention of the cough in notes from his visit to the same doctor early the next month. (*See id.* at 286, 289.) At most, the record reflects persistent, moderate pulmonary problems in 2003. Based on the foregoing medical evidence, I find the ALJ's determination that such symptoms did not constitute severe impairments was well-supported.

Finally, without a single citation to the record, Plaintiff argues that his hypertension constitutes a severe impairment. (Pl.'s Br. at 20–21.) The court did find one notation in the record suggesting Plaintiff's blood pressure was difficult to control due to complications with

other medicines. (Admin. R. at 208.) Otherwise, the record reflects that Plaintiff's condition was well-controlled with medication. (*See id.* at 147, 212–16, 258.) Moreover, beyond Plaintiff's testimony that he "feel[s] a little dizzy . . . in the morning time . . . when [he] go[es] to get up out of bed," (*id.* at 326), the record is devoid of any indication that Plaintiff's high blood pressure had any notable physical manifestations, (*see id. passim*). Without evidence of work-limiting symptoms of high blood pressure, I cannot upset the ALJ's determination.

### (3) Credibility

Plaintiff asserts the ALJ's reasons for finding him less than fully credible were not based on substantial evidence. (Pl.'s Br. at 21–22.) "Credibility is the province of the ALJ." *Musgrave v. Sullivan*, 966 F.2d 1371, 1376 (10th Cir. 1992) (citation and quotation marks omitted). Indeed, credibility determinations made by an ALJ are generally considered binding upon review. *Gossett v. Bowen*, 962 F.2d 802, 807 (10th Cir. 1988). Such determinations "should not be upset if supported by substantial evidence." *White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001). I find that there was ample evidence upon which to base a finding that Plaintiff was not credible.

The essence of the ALJ's credibility determination was the fact that Plaintiff's "contention that he experiences monthly flare-ups of gout was completely unsubstantiated by the medical evidence of record, which reflected only two such flare-ups." (Admin. R. at 21.) Between Plaintiff's alleged onset date in February 2003 and the date of the ALJ's decision, Plaintiff only twice complained of gout — first in August 2003 and then in January 2004 — despite regular visits to multiple doctors. (*Id.* at 135–37, 211.) Both flare-ups improved with medical treatment. (*See id.*) As the ALJ noted, this record sharply undermines the credibility of Plaintiff's assertions

-23-

regarding the severity of his gout, since he claimed he suffered monthly — rather than yearly — gout flare-ups. (*Id.* at 21.) Consequently, I cannot say that the ALJ's conclusion that Plaintiff was "not wholly credible" is contrary to the record evidence. The ALJ's credibility determination must stand.

**4.      Conclusion**

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is AFFIRMED in part and REVERSED in part. The case is hereby REMANDED for proceedings consistent with this opinion.

Dated this 6th day of December, 2007.

                                        BY THE COURT:


                                        s/ Edward W. Nottingham
                                        EDWARD W. NOTTINGHAM
                                        Chief United States District Judge